R. J. PERKINS v. B. F. WILCOX, Appellant.

Division Two, June 19, 1922.

1. **INJURY TO DECEASED HUSBAND**: Survival of Action. At common law a personal right of action dies with the person, and the wife cannot recover for personal injuries to her deceased husband under the common law. She can only recover, if at all, under the statute (Secs. 4218, 4219, R. S. 1919).

2. ————: ————: Punitive Damages. Under the statute (Secs. 4217 to 4219, R. S. 1919) the surviving wife can recover at most only ten thousand dollars as damages for the death of her husband caused by injuries inflicted upon him by defendant, and cannot have ten thousand dollars as compensatory damages and in addition ten thousand dollars as punitive damages.

3. **CAUSE OF ACTION**: Disturbing Plaintiff's Sick Husband. Defendant had obtained judgment of ouster and for damages against plaintiff's husband for refusal to vacate a rented farm, and the constable, accompanied by defendant, went to the house with a writ of execution to place defendant in possession. Finding plaintiff and her husband already loading their goods and prepared to move, the constable entered the house where the husband was sitting and began peaceably to talk with him about the payment of the damages and costs. The husband's father, who resided elsewhere but had come into the house, told his son to pay no attion to the constable. After some further quarrelling, the father and constable began to fight, and the father got him down on the floor, took his pistol from him, ordered him out of the house, and with the pistol in hand marched him through the door and on to the porch, whereupon the constable took another pistol from his pocket and shot the father, but did not seriously injure him. The defendant had had no conversation with the father or son, was not present while these occurrences were going on, but was at a barn forty or fifty feet away; but another man, who was present to help haul the goods, ran to the barn crying aloud that the father had the constable down on the floor and might hurt him. The defendant moved a few feet towards the house, and seeing the father with a gun in his hand following the constable shouted to the constable to shoot him again. Plaintiff's husband at the time had had influenza, but was up and dressed and ready to drive away in a buggy prepared for his use; he drove away in a few moments to a neighbor's and six weeks later an abscess

Perkins v. Wilcox.

formed in his lungs, and an operation was performed, but he grew worse, and died from the effects of a second operation three months after the disturbance at the house; he was excited by the disturbance in the house, and plaintiff bases her. cause of action on the claim that the excitement and his going out into the weather in his weakened condition accelerated the disease and ultimately caused his death. *Held*, that, if plaintiff had any cause of action at all for her husband's death, it was against his father, who unlawfully brought on the disturbance, and not against defendant, who was lawfully on the premises and cannot be said to have caused the death of the husband. ·

4. **INTERFERENCE WITH AN OFFICER.** To obstruct and resist an officer in the peaceable and orderly performance of his duty in executing a legal judgment of court is wrongful and unlawful.

5. **HYPOTHETICAL QUESTION:** Acts of Others. A question asked of an expert which contains material matters based on the acts of others for which defendant is not responsible, is improper, and an objection thereto should be sustained.

6. **CAUSE OF ACTION:** Death of Husband: No Physical Injury. A wife cannot recover damages for the death of her husband, where no physical injury was inflicted by the wrongful acts of defendant and there is no substantial evidence tending to show a causal connection between his alleged wrongful acts and the disease which caused her husband's death.

7. ———: ———: Causal Connection: Influenza: Abscess of Lungs: Caused by Excitement and Exposure. Plaintiff's husband had rented a part of defendant's farm, and a judgment of ouster had been rendered against him, and the constable, accompanied by defendant, had come to the house with a writ of execution to place defendant in possession, and a quarrel and fight occurred in the house between the husband's father and the constable, in the presence of the husband, and the father got the constable down on the floor, took his pistol from him, drove him from the house, and on the porch was shot by the constable with another pistol, but not seriously hurt. Plaintiff's husband had had influenza, but had about recovered, and after the disturbances got in a buggy already prepared for his use and drove to a neighbor's, and drove or was driven about the neighborhood occasionally for six weeks, when an abscess of the lungs developed, for which he was operated upon by attending physicians, but grew worse for the next six weeks, when another operation was performed, from the effects of which he died the following day. There was some evidence that he was excited by the disturbances at the time of the fight and that excitement would tend to make his condition worse, but, *Held*, that, even if the

defendant's connection with the fight in the husband's presence were shown, any supposed causal conection between defendant's acts and the husband's death is based on mere conjecture.

Appeal . from Christian Circuit Court.—*Hon. Fred Stewart,* Judge.

REVERSED.

*W. M. Bowker, John S. Haymes, L. T. Wilson* and *G. P. Hays* for appellant.

(1) The wife, suing for the wrongful death of her husband, cannot recover to exceed ten thousand dollars for both compensatory and punitive damages. Secs. 4218, 4219, R. S. 1919. (2) Section 4218 and Section 4219, Revised Statutes 1919, are in derogation of the common law and must·be strictly construed. Troll v. Gas Light Co., 182 Mo. App. 600; Jackson v. Ry. Co., 87 Mo. 422; Bates v. Sylvester, 205 Mo. 493. (3) Section 4218 does not authorize a recovery except where the wrongful act caused the death—not where it contributed to or hastened the death of the decedent. Jackson v. Ry. Co., 87 Mo. 422. (4) The courts hold that, unless the petition charges the acts and injuries to decedent to have been wanton, willful or malicious, the matter of punitive damages cannot be submitted to the jury. State ex rel. Dunham v. Ellison, 278 Mo. 649; Tavis v. Bush, 280 Mo. 383. (5) Experts are not permitted to give testimony on the matters directly in issue. Fausette v. Grimm, 193 Mo. App. 585; Henson v. Kansas City, 277 Mo. 443; Mukel v. Ry. Ass'n., 205 Mo. App. 484. (6) The hypothetical question must be based on the evidence in the case. Ridenour v. Mining Co., 164 Mo. App. 576. (7) Constable Evans was merely performing his official duty in calling upon W. C. Perkins with the execution when, it is alleged, the injury took place. (a) When appellant recovered judgment for the possession of his property, damages and costs, his right to execution followed, and when it was issued the constable was bound

to obey it and to use reasonable diligence in searching
for property. Fountaine v. Hudson, 93 Mo. 70; Burton
v. Sweaney, 4 Mo. 3; Fisher v. Gordon, 8 Mo. 390. (b)
With the discharge of the constable's duties, the elder
Perkins had no right to interfere. R. S. 1909, sec. 4364;
State v. Dickerson, 24 Mo. 368. (c) Undoubtedly the
constable was not required to silently and tamely submit
to the acts of J. M. Perkins tending to defeat his lawful
purpose, for the powers of an officer are equal to his
duties. Nichols v. Reyburn, 55 Mo. App. 7; State ex rel.
v. Gates, 67 Mo. 143; 3 Greenleaf on Ev. (14 Ed.) sec.
65. (d) Respondent's own evidence showed that at the
time Evans shot the elder Perkins, and at the time appel-
lant called to the constable to shoot (whether it was be-
fore or after the shot was fired), both had good reason
to believe that action was necessary in defense of one or
both. The one, therefore, had the right to act to defend
himself, and the other to call for action in defense of
himself or another, for what one may do for himself, he
may do for another. State v. Reed, 137 Mo. 125; State
v. Totman, 80 Mo. App. 125; Brouster v. Fox. 117 Mo.
App. 711. (e) Since, for the two reasons, nothing more
was done than the law permits, no legal liability resulted
from the doing. Holland v. Depriest, 65 Mo. App. 333;
Mining Co. v. Mining Co., 50 Mo. App. 534; Charles v.
Rankin, 22 Mo. 566; Nations v. Pulse, 175 Mo. 94;
Bishop on Non-Contract Law, sec. 202. (8) An injured
party cannot add to injuries received at the hands of
another, and recover for the increase; and even if the
deceased was injured by an act of appellant, and it was
aggravated by an exposure to which he subjected himself,
no recovery can be had therefor. Francis v. Transit
Co., 5 Mo. App. 7; Fullerton v. Fordyce, 144 Mo. 532;
Railroad v. McGrew, 104 Mo. 291; Detrich v. Railroad,
89 Mo. App. 40. (9) A verdict based upon conjecture
and speculation will not be permitted to stand; and as
appellant's own evidence shows that the death of her
husband may have resulted from one of several things

and does not show from which it did result, and for some of the causes, at least, appellant would not be liable, there can be no recovery. Demaet v. Storage Co., 121 Mo. App. 105; Biddlecom v. Nelson Grain Co., 178 S. W. 750; Warner v. Railroad, 178 Mo. 134; Root v. Railroad, 195 Mo. 367; Smart v. Kansas City, 91 Mo. App. 592. (10) Where there has been no bodily injury nor trespass there can be no recovery for injuries caused by fright, shock, agitation or mental anguish. Strange v. Railroad, 61 Mo. App. 586; Trigg v. Ry. Co., 74 Mo. 147; Connell v. Western Union, 116 Mo. 34; McCardle v. Geo. Peck D. G. Co., 271 Mo. 111; Hunter Bros. Milling Co. v. Stanley, 132 Mo. App. 308; Smith v. Pullman Co., 138 Mo. App. 238; McGee v. Van Over, 147 S. W. 742; Chesepeak Ry. Co. v. Bobinett, 152 S. W. 976; Leahman v. Brooklyn, 47 Hun, 355; Spade v. Ry. Co., 168 Mass. 285, 38 L. R. A. 512; Braun v. Cravens, 175 Ill. 401; Ewing v. Ry. Co., 14 L. R. A. 666; Sanderson v. Ry. Co., 60 L. R. A. 403; Bell v. Great Northern Ry., 26 L. R. A. 428; Houston v. Freemanburg, 212 Pa. 548; Hutchinson v. Stern, 101 N. Y. S. 145.

*Moore, Barrett & Moore, L. Cunningham, Hamlin & Hamlin* and *C. W. Hamlin* for respondent.

(1) This suit was undoubtedly based on what is now Sections 4218 and 4219, Revised Statutes 1919, and plaintiff is therefore limited by that law to $10,000 as a maximum amount which she can recover. In this case the petition asked for $10,000 compensatory and $15,000 punitive damages. Defendant answered and went to trial—raising no question about the amount sued for, and now on appeal it has been discovered that the petition not only overshot the mark, but that the verdict of the jury was for twice the maximum that plaintiff was entitled to recover under the statute. Since the judgment has been suspended by this appeal and the verdict being in excess of the limit under the statute, this respondent, if permitted to do so, will willingly and gladly enter a *remit-*

*titur* of an amount sufficient to bring the verdict and the judgment down to within the limits of the Damage Act. (a) This can be done. Higgs v. Hunt, 75 Mo. 106; Cook v. Globe Printing Co., 227 Mo. 471, 546; Burdict v. Railway Co., 123 Mo. 242; Reynolds v. Transit Company, 189 Mo. 423. (b) The judgment should be affirmed upon *remittitur* being made. Railroad v. Herbert, 116 U. S. 642; Clifton v. Ry. Co., 232 Mo. 708; Sperry v. Hurd, 267 Mo. 628. (c) Where the verdict is enlarged by an ascertainable amount through error, the erroneous amount may be eliminated by *remittitur*. Howell v. Jackson County, 262 Mo. 403, 420. (2) Where different theories as to the cause of death are presented in a case, it is for the jury to say which is the correct one and the jury having spoken on this point this court will not interfere. MacDonald v. Street Railway, 219 Mo. 468, 483; Seckinger v. Mfg. Co., 129 Mo. 590; Fetter v. Casualty Co., 174 Mo. 256; Sharpe v. Railway, 213 Mo. 528. (3) One who is present aiding, abetting and encouraging either by words, looks, signs or other acts, another in doing something that causes or directly contributes to the death of that other, is liable as principal. Gray v. McDonald, 104 Mo. 303; Brown v. Barr, 184 Mo. App. 451. (4) If the conduct of a defendant is found to be a direct or contributing cause of the death of another by being the cause of exposing that other to the weather under such conditions as to bring on or aggravate a disease which terminated fatally he is liable in damages. Ehrgott v. New York City, 96 N. Y. 264; Milwaukee Railroad v. Kellog, 94 U. S. 469; 1 Sedgwick on Damages (9 Ed.) sec. 122. (5) If the conduct of appellant was such as to cause the deceased through fear and terror to go out into the weather improperly wrapped while suffering from sickness, in other words in such a physical condition as to cause him to grow worse and eventually die, the conduct of defendant amounts to a physical injury to the deceased, and he is therefore liable for the result of said injury. Mollman v. Electric Co., 227 S. W. 264; Bonil-

294 Mo.—45

lion v. Gas Co., 148 Mo. App. 462; Lesch v. Railroad, 106 N. W. 955. (6) Where a physical injury inflicted or caused to be inflicted by the defendant produces a disease or aggravates an existing one which proves fatal, defendant is liable in damages. Equitable Life Assurance Society v. Lester, 110 S. W. 499; Breshears v. Pa. Traction Co., 36 Atl. 914. (7) Where a physical injury stimulates or aggravates an existing disease which proves fatal the party responsible for the injury may be held liable in damages. St. Louis Trust Co. v. Murmann, 90 Mo. App. 560; Neff v. City of Cameron, 213 Mo. 350, 363; Brown v. Railway, 66 Mo. 588, 597; Smart v. Kansas City, 208 Mo. 162, 206; Hammond v. Packing Co., 107 Mo. App. 542; Deleplain v. Kansas City, 109 Mo. App. 107; West v. Railway, 187 Mo. 351; Railroad v. Hecht, 115 Ind. 443; Strode v. St. L. Transit Co., 197 Mo. 616, 628. (8) Simply because an officer has a lawful writ in his pocket does not render him immune from his unlawful and unnecessary acts. An officer must do his duty in a lawful manner. Healey v. Range Co., 161 Mo. App. 483; State v. Meyers, 174 Mo. 352. Even if the constable had the altercation and did the shooting yet if the appellant was present participating in the melee by encouraging, prompting, inciting and advising said constable to shoot the elder Perkins the appellant would be liable as a principal. McManus v. Lee, 43 Mo. 206; Gray v. McDonald, 104 Mo. 303; Brown v. Barr, 184 Mo. App. 451; Cooper v. Johnson, 81 Mo. 487. Where the result of the defendant's conduct was such as to shorten the victim's life, either by resulting in a fatal disease, or by general debilitating effect, heavy damages are recoverable. 4 Sedgwick on Damages (9 Ed.) sec. 1362; San Antonio Trac. Co. v. Probandt, 125 S. W. 931; Cooper v. St. Paul Ry., 56 N. W. 42. The question as to what caused the pneumonia and the consequent formation of pus in the plural cavity and which resulted in victim's death, the jury is to determine. Fetter v. Fidelity & Casualty Co., 174 Mo. 266. (9) Appellant's

·counsel raises the question that hypothetical questions must be based on all the evidence in the case.   While as a general proposition that may be true, it is said, however, that "it is the right of counsel to assume, within the limits of evidence, any state of facts which he claims the evidence justifies and have the opinion of experts upon the fact thus assumed."   Lawson on Expert & Opinion Evidence (2 Ed.) p. 166; Fullerton v. Fordyce, 144 Mo. 531; Russ v. Railway, 112 Mo. 48; Smart v. Kansas City, 208 Mo. 172.    (10)   Appellant seeks to justify the shooting of the elder Perkins on the theory that at the time appellant told the constable to "shoot him" both the constable and appellant had good reason to believe that that action was necessary for their own protection.   This was, under the evidence, a disputed question and one to be passed upon by the jury.   Surely, any one reading the instructions asked by appellant and given by the court will not say that appellant did not get the full benefit of his contention on this point before the jury.   That tribunal decided this point against him, and their decision ought not to be disturbed.   Maloney v. United Rys. Co., 237 S. W. 509.

RAILEY, C.—This action was commenced by plaintiff, as the widow of W. C. Perkins, deceased, in the Circuit Court of Polk County, Missouri, and transferred by change of venue to Christian County.

The first count of the petition alleges that plaintiff is the widow of said W. C. Perkins, who departed this life on April 8, 1919, leaving said plaintiff and four small children; that on the ——of December, 1918, her said husband contracted influenza and, by reason thereof, ·was confined to his bed from said date until the 8th day of January, 1919; that on said last mentioned date, he was improving physically, and convalescing rapidly, so that he would have recovered from said illness, if defendant had not committed the acts hereafter alleged; that on January 8, 1919, defendant wrongfully and maliciously, knowing that said W. C. Perkins was sick as afore-

said, caused the constable of Marion Township, Polk County, Missouri, to go to the home of plaintiff and her said husband, and wrongfully and maliciously caused, instigated, encouraged and aided said constable to make an assault on her husband's father, by shooting him with a loaded revolver in the presence cf her said husband, and also instigated the arrest of her husband's father by said constable; that by reason of the foregoing, and the belief of her husband that his father had been shot and fatally wounded, and owing to her husband's weak physical condition at the time, he became greatly agitated, nervous and excited; that by reason of the foregoing, her husband was compelled to drive from their home, unassisted, improperly wrapped and clothed, in a buggy, in cold, damp, windy weather, a great distance; that by reason of his excitement, agitation and nervousness, caused by defendant's acts aforesaid, and by reason of his exposure aforesaid, the disease from which he was then suffering, was aggravated, its virulence increased and finally caused his death on April 8, 1919; that by reason of defendant's conduct aforesaid, and the death of her husband, she lost the aid, support and comfort of the latter; that he was thirty-two years of age, possessed splendid habits, and contributed annually from $600 to $1,000 to the support of his family. Said first count concludes with a prayer for $10,000 actual damages, and $15,000 punitive damages.

The second count of petition is practically the same as the first, except it charges that the acts of defendant complained of "contributed to and hastened the death of her husband, by reason of which she lost his aid, support and comfort."

Defendant demurred to each count of said petition, and his demurrers thereto were overruled.

The answer to the first count contains a general denial. It also alleges that all of the constable's acts were performed as a part of his duties, as such constable, in the service of the writ of execution, then in his hands for

service, and in the necessary defense of his person from danger at the hands of deceased's father, etc. Defendant's answer to the second count of the petition was similar to the one filed as to the first count.

It appears from the evidence that defendant was the owner of about 370 acres of land near Pleasant Hope, in Polk County, Missouri; that in the spring of 1918, respondent and her husband rented a part of said land, and were to vacate the same when the crop thereon was made; that on January 8, 1919, they were still occupying said premises; that on their failure to vacate the same under the agreement, defendant commenced an action in the justice's court of Polk County, to recover possession of said land; that on December 11, 1918, he recovered a judgment against plaintiff's husband for the possession of said premises, for $25 as damages, and for the costs incurred in said action; that an execution was issued on said judgment, on said December 11, 1918; that at this time, some of respondent's family were sick with the influenza, so that appellant waited until January 8, 1919, after hearing that respondent's family had recovered or were recovering from illness, before he attempted to have said execution enforced; that on said last named date, the appellant went, with Thad Evans, the constable of that township, to the premises aforesaid, to see whether respondent and her husband had vacated the same; that Evans took with him the execution aforesaid. When they arrived at said land, they found respondent and her husband were preparing to move; that they had nearly all their goods loaded into the wagons: that respondent's husband was up and dressed, ready to drive away in a buggy then standing in the yard. On their arrival at the farm, they found J. M. Perkins, the father of respondent's husband, out in the yard. The constable asked him where his son was, and the father told him he was in the house. The constable then went into the house to see W. C. Perkins, the husband of plaintiff; that appellant unhitched his horse and took it to

the barn, about forty or fifty yards from the house. When the constable went into the house, he found practically everything loaded for removal, so he said nothing to them about vacating the place, but did talk to respondent and her husband about the payment of the costs, called for in the execution. While they were talking over this subject, respondent's father-in-law, J. M. Perkins, came into the house, and told his son not to pay any attention to the constable, that he did not owe anything. After some further quarrel, between the constable and J. M. Perkins, they engaged in a fight or scuffle, in the room where plaintiff's husband was sitting. There is some controversy as to how the fight actually commenced, but they clinched, Perkins got the constable on the floor, took his pistol away from him, ordered him out of the house and with the constable's pistol in his hand, marched him out of the door, on to the porch, and then ordered him off the place. As the constable stepped off the porch, he got another pistol out of his pocket, and shot J. M. Perkins, but did not kill or seriously wound him. During all this trouble in the house, appellant was some distance away at the barn, and knew nothing about what had occurred, until Rome Clark, who was helping to move plaintiff and family, came to the barn and told defendant that J. M. Perkins had the constable down on the floor of the house, was liable to hurt him, and advised appellant to go up and separate them; that appellant said he did not want to do it, and asked Clark to do so, and the latter declined; that appellant and Clark both started towards the house, and when they got near the house Evans came out first, and Perkins was behind him with a gun in his hand following him; that Perkins was the only one that said anything; that when Evans came off the porch he turned and shot Perkins; that appellant, at this stage of the proceeding, while thirty or forty feet away, called to the constable to shoot him again, but, instead of doing so, he told Perkins to drop his gun, and the latter did so.

J. M. Perkins testified that the constable was talking to his son about the costs, in an ordinary tone of voice, and in a gentlemanly way, when he told the son not to pay any attention to the constable; that the barn was at least forty or fifty yards from the house. Witness testified that, when he heard the talk about the costs, he said to his son: "Here, Billy, you are getting shook to pieces. You are getting all tore up. Don't pay no attention to this fellow;" that he also told him, "You don't owe them anything." He further testified: "After I throwed him down and took the gun away from him, I told Mr. Evans not to say anything more to my son. After I took the gun away from him, I said, 'Get away from here and let my son alone.'" This witness also testified that after he took the gun away from the constable he followed the latter out on the porch, and the constable got off the porch; that he still had the constable's gun in his hand, ordered him to leave the place, and then the constable shot him. He said appellant was about forty feet away, under the pump, when he told the constable to shoot witness.

There is nothing in the record tending to show that appellant had any reason to anticipate any difficulty until he was told of the trouble by Clark. The evidence is undisputed that after the difficulty respondent's husband voluntarily hitched his horse to the buggy, got into the latter, without any suggestion from anyone, and, of his own accord, drove a quarter of a mile to Gilmore's, where his wife and children had gone, and stayed there all night.

The shooting occurred on January 8, 1919, and plaintiff's husband did not die until April 8, 1919.

In order to avoid repetition, we will consider the remaining facts, the instructions and rulings of the court, as far as necessary, in the opinion.

Nine of the jurors returned a verdict in favor of respondent on the first count of petition for $10,000, as actual damages, and $10,000 as punitive damages, but

made no finding as to the second count of petition. Judgment was entered accordingly. Defendant, in due time, filed motions for a new trial and in arrest of judgment. Both motions were overruled, and the cause duly appealed by him to this court.

I. This case seems to have been tried by the court, and counsel for respondent, in utter disregard of either the statute or common law. There could be no recovery in a death case under the latter, for the obvious reason that a personal right of action dies with the person. Considered as a suit under the statute, the maximum amount of recovery in a death case is $10,000, and yet the plaintiff sued for $25,000 and the court actually permitted a judgment to be entered for $10,000 as compensatory damages, and a like amount for exemplary damages. The death of plaintiff's husband occurred on April 8, 1919, and we will dispose of the case as a statutory action, under Sections 5426 and 5427, Revised Statutes 1909, now Sections 4218 and 4219, Revised Statutes 1919.

II. It is contended by appellant that, at the conclusion of all the testimony in the case, the trial court should have sustained his demurrer to the evidence, and directed a verdict in his behalf. Section 4218, supra, provides that:

**Demurrer to Case.**

"Whenever the death of a person shall be caused by a wrongful act, . . . and the act . . . is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, . . . the person who . . . would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured."

The person who may sue and the amount of recovery are determined by Sections 4217 and 4219, Revised Statutes 1919. In the first count of the petition, it is charged that defendant's wrongful acts caused the death of plain-

tiff's husband. Nine of the jurors returned a verdict for
plaintiff under said first count for $10,000 actual and
$10,000 punitive damages, but the jury made no finding
as to the second count, which charged that the acts and
conduct of defendant contributed to and hastened the
death of plaintiff's husband. It is asserted by counsel
for respondent in their brief (p. 12) that "the jury in
effect found for appellant on said second count."

The facts are set out very fully heretofore, and need
only be referred to in a general way. The evidence is
undisputed that appellant was the owner of the real es-
tate in controversy; that he had reserved the use of a
room in his dwelling house thereon occupied by plaintiff
and her husband, and was therefore lawfully on the
premises; that on December 11, 1918, a judgment was
entered in favor of this defendant, against W. C. Perkins,
the husband of plaintiff, for the possession of said prem-
ises, for $25 as damages, and for costs amounting to
$8.10; that on said December 11, 1918, a valid execution
was issued on said judgment, and delivered to T. S.
Evans, the constable of Marion Township in Polk Coun-
ty, Missouri; that said execution directed said constable
to dispossess said W. C. Perkins, to deliver possession
of said premises to this defendant, and to collect from
said W. C. Perkins the damages and costs aforesaid;
that on the morning of January 8, 1919, before said con-
stable and defendant arrived at said premises, J. M.
Perkins, the father of plaintiff's husband, and one Rome
Clark, had reached said premises with wagons, and had
loaded thereon nearly all the goods of plaintiff and her
husband, with the view of moving them from said place
on that morning; that the horse was hitched to the
buggy for plaintiff's husband to use in leaving, or was
harnessed, ready to be hitched to said buggy; that
plaintiff, her husband and those hauling the goods were
nearly ready to leave when defendant arrived, and would
have been gone in thirty minutes from said premises,
except for the temporary subsequent delay. When the

constable and defendant arrived, J. M. Perkins was in the yard. The constable told him he wanted to see his son, W. C. Perkins, and asked where he was. J. M. Perkins replied that his son was in the house, and told the constable how to get in. The defendant took no part in this conversation, unhitched his horse, and took it to the barn forty or fifty yards distant; and knew nothing of what occurred in the house between the constable and J. M. Perkins, until Rome Clark came down to the barn hallooing at the top of his voice and told him that old man Perkins had the constable down, and might hurt him. He advised defendant to go up and separate them. Finally, Clark and defendant started toward the house, and when they got within thirty or forty feet of same, the constable came out of the house, pursued by J. M. Perkins, with a pistol in his hand, who was then shot by the constable, with the second pistol which the latter retained in his possession. Plaintiff's husband was still in the house where the combat between the constable and his father took place. Up to this point, the defendant had not been in the house, had no conversation with plaintiff's husband, had not seen him, did not know where he was, nor did he know what his physical condition was at that time. The defendant had absolutely no connection with what occurred in the house before the shooting, nor was he in any manner responsible therefor. On the other hand, J. M. Perkins illegally and wrongfully interfered with the constable, while the latter was performing his duty in a legal and proper manner. [Sec. 3147, R. S. 1919; State v. Dickerson, 24 Mo. l. c. 368.]

In the latter case, RYLAND, J., speaking for this court, said: "The law has pointed out the mode of carrying on the public justice of the country; officers are elected or appointed to execute the judgments of our courts, and they are clothed with certain power and authority, and they are required to perform certain duties. The person then who obstructs or resists such officer in performing his duty rises up against the power of the

State, and should be punished for his crime, not like a mere trespasser on the rights of another person or on his property, but as one who disregards the well-being and good of the government of his state.''

The father of plaintiff's husband was not a renter upon said place, and even if he had been the writ in possession of the constable directed the latter to deliver possession of same to the defendant, and therefore the father had no legal right to interfere with the constable in the performance of his duty. The father did not inform the constable that his son was sick, and ask him to desist from discussing the costs with him under such circumstances, but in an angry manner ordered his son to ignore the officer, and thereby commenced the controversy heretofore mentioned. We are of the opinion that the father of plaintiff's husband deliberately and unnecessarily brought on a difficulty with the constable in the presence of his sick son, whom he said was then ''shaken up,'' without the semblance of excuse therefor. The constable was making no effort to remove any of the parties from the premises, as he knew they were practically packed and ready to move. In a proper and gentlemanly manner, he was discussing the question of costs with plaintiff and her husband, when the father appeared upon the scene, and precipitated a controversy with the constable which was well calculated to excite his son and make him nervous. If the plaintiff ever had a cause of action of any kind, growing out of the disturbance in the house, in the presence of her husband, it was against her husband's father and not against this defendant.

Turning to the evidence, we find that plaintiff introduced five doctors, as experts, to prove that defendant's wrongful acts caused the death of plaintiff's husband. As a sample of the questions propounded to said experts, we quote from the record the one propounded to Dr. Homer Young, which reads as follows:

''Q. I'll ask you whether or not if a man was sick with flu, had been sick something like thirty days, had

been delirious part of the time, had been confined to his bed a greater part of the time, had become improved so that he could set up at short times and an officer should come to his house to put him out;. while there in his presence the officer should attempt to forcibly put the sick man's father out from the room in which they were, and they should engage in a struggle in the presence of the sick man, and the constable should shoot the father *and the other man should holler, 'Kill! Kill! Shoot him!,'* whether or not the excitement would cause a decrease in his vitality and resisting powers?"

The only part of said question relating to defendant's conduct is the italicised portion. A timely and proper objection was made to the above question, and improperly overruled. Leaving out of consideration the conduct of defendant in telling the constable to shoot J. M. Perkins after he had forced the constable from the house at the point of a gun, while plaintiff's husband was still inside the house, it will be seen that the controversy between the constable and the father in the house was improperly treated as the act of defendant, and that the legal effect of the latter's act, based on his own conduct, was never submitted to either the experts or jury. Dr. Young answered the above inquiry as follows:

"A. Well, I would like to know further if there were any complications arising from this flu.

"Q. None stated.

"A. I would have to answer that question rather limited. As a general rule any excitement will tend to make his condition worse."

The father said to his son, when he entered the house and found the constable talking to him: "Here, Billy, you are getting all tore up. Don't pay no attention to this fellow." It is pertinent to inquire what part of the son's excitement was attributable to the alleged wrongful acts of defendant, which it is asserted caused the death of plaintiff's husband? The question propounded to the experts were improper, because they contain material

matters based upon the acts of other parties, and for which the defendant was not responsible. The questions and answers were purely speculative in their nature, based upon mere conjecture, and appellant's objections thereto should have been sustained. [O'Malley v. Railway, 113 Mo. l. c. 325; Warner v. Railroad, 178 Mo. 125; McGrath v. Railroad, 197 Mo. l. c. 104-5; Swearingen v. Railroad, 221 Mo. 644; Fritz v. Railroad, 243 Mo. l. c. 79-80; Grant v. Railway Co., 190 S. W. l. c. 589-90; Phillips v. Travelers' Ins. Co., 231 S. W. (Mo.) l. c. 950.]

III.   The evidence shows that plaintiff's husband, on the morning of January 8, 1919, was feeling well enough to get up and dress himself preparatory to voluntarily leaving defendant's premises; that his goods were practically all packed, his horse and buggy ready for departure, and that in less than thirty minutes from the time of defendant's arrival plaintiff and her husband would have moved, except for the quarrel and shooting which subsequently occurred. Within a short time after the shooting, plaintiff's husband came out to see his father and learned from the latter that he was not seriously hurt. Thereupon, plaintiff's husband hitched the horse to the buggy, got into the latter, and drove to Gilmore's, where his family had gone, one quarer of a mile distant. In other words, he left defendant's premises, shortly after the shooting, of his own accord, without any suggestion from either the defendant or constable, and left just as he would have done had neither the defendant nor the constable been present. It further appears from the evidence that he either drove, or was driven, around the neighborhood occasionally until February 27, 1919, when he developed a case of empyema, which is commonly called an abscess of the lungs; that he was operated on at that time for this abscess by the attending physicians; that he grew worse from that time on, until April 7, 1919, when a second operation was performed; that he died from the effect of said disease, on the following day, just three months after the trouble at defendant's premises.

It clearly appears from the testimony that defendant never saw plaintiff's husband on January 8, 1919, until after the shooting; that deceased was in the house at the time of said shooting, and was not in the presence of defendant; that defendant was not aware that plaintiff's husband was in the house, sick. Appellant knew the constable had an execution, which authorized him to turn over the possession of the premises to appellant, and to collect the damages and costs called for therein. After being informed by Clark that J. M. Perkins had the constable down on the floor and was liable to hurt him, defendant, with Clark, then started to the house and got within thirty or forty feet of same, when defendant saw the constable being ejected from the house by an intruder, with a gun in his hand, and hallooed to the constable to shoot him, which the officer did. It conclusively appears from the testimony, that plaintiff's husband received no physical injury at the hands of defendant. We are decidedly of the opinion that, even if defendant had been armed, and had actually shot J. M. Perkins, himself, instead of calling upon the constable to do so, under the peculiar facts of this case there can be no recovery. [Trigg v. Railway, 74 Mo. l. c. 153 and cases cited; Marshall v. Railway, 78 Mo. l. c. 615-6; Connell v. Western U. Tel. Co., 116 Mo. 34 and cases cited; McCardle v. Peck Dry Goods Co., 271 Mo. l. c. 120, 195 S. W. l. c. 1036; Francis v. Transfer Co., 5 Mo. App. 7; Strange v. Railway Co., 61 Mo. App. 586; Deming v. Railway Co., 80 Mo. App. 152; Snyder v. Railway Co., 85 Mo. App. l. c. 497; Grayson v. Transit Co., 100 Mo. App. 60; Glover v. Railroad, 129 Mo. App. 563; Crutcher v. Railroad, 132 Mo. App. 311; Dye v. Railroad, 135 Mo. App. 254; Smith v. Pullman Co., 138 Mo. App. l. c. 245; McCardle v. Peck Dry Goods Co., 191 Mo. App. 1 c. 264-5, 177 S. W. 1095; Dalzell v. Dean Hotel Co., 193 Mo. App. l. c. 391, 186 S. W. l. c. 44; 8 Ruling Case Law, sec. 80, p. 525, where numerous cases are cited, and most of which are here set out; *Reed v. Ford, 129 Ky. 471; Braun v. Craven, 175 Ill. 401; Miller v. Rail-*

*road, 78 Ohio St. 309;* Spade v. Railroad, 168 Mass. 285; White v. Sander, 168 Mass. 296; Mitchell v. Railway, 151 N. Y. 107; Ewing v. Railway, 147 Pa. St. 40; Huston v. Freemansburg Boro, 212 Pa. St. 548; Morris v. Railroad, 228 Pa. St. 198; St. Louis Ry. Co. v. Bragg, 69 Ark. 402; Chapman v. Western U. T. Co., 88 Ga. 763; Kalen v. Railroad, 18 Ind. App. 202; Kagy v. Western U. Tel. Co., 37 Ind. App. 73; Lee v. City of Burlington, 113 Iowa, 356; McGee v. Vanover, 148 Ky. 737; Wyman v. Leavitt, 71 Me. 227; Nelson v. Crawford, 122 Mich. 466; Western U. Tel. Co. v. Rogers, 68 Miss. 748; Chittick v. Transit Co., 224 Pa. St. 13; Simone v. Rhode Island Co., 28 R. I. 186; Gulf Ry. Co. v. Trott, 86 Tex. 412.]

Tested by the principles of law declared in the Missouri cases supra, and re-inforced, as they are, by the other authorities cited, especially those italicised, we have no hesitation in holding, that on the facts disclosed by the record, in the absence of any physical injuries inflicted by the alleged wrongful acts of defendant, the plaintiff is not entitled to maintain this action. The foregoing authorities leave no room for cavil or doubt as to the correctness of our conclusion. She had no remedy at common law, and we do not believe the death statute relied on was ever intended to cover a case of this character. Aside from the foregoing, reverting to the merits of the controversy, we hold that there is no substantial evidence in the record tending to show any causal connection between the alleged wrongful acts of defendant and the death of plaintiff's husband, caused by disease three months after the shooting. In conclusion, we are of the opinion, that the facts herein, relating to the merits of the controversy, do not rise to the dignity of even respectable conjecture.

The judgment below is accordingly reversed. *Reeves* and *White, CC.,* concur.

PER CURIAM:—The foregoing opinion of RAILEY, C., is hereby adopted as the opinion of the court. All of the judges concur.